# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BAY VISTA OF VIRGINIA, INC., | ) | |
| | ) | Case No. 07-71213-SCS |
| *Debtor.* | ) | |
| | ) | |
| | ) | |
| TOM C. SMITH, JR., | ) | |
| CHAPTER 7 TRUSTEE, | ) | |
| | ) | APN 08-07083-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LITCHFORD & CHRISTOPHER, P.A., | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial on February 22, 2010, on the Complaint of Tom C. Smith, Jr.,

Chapter 7 Trustee for Bay Vista of Virginia, Inc. ("Trustee"), against Litchford & Christopher, P.A.[1]

("Litchford"), to recover a purported fraudulent transfer of funds pursuant to 11 U.S.C. §§ 548(a)(1)

and 550(a). The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2)

and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the

evidence and arguments presented by counsel and the pleadings submitted, the Court makes the

following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure

---

[1] The Complaint of the Trustee originally named as the defendant herein as "Litchfield & Christopher, P.A." After the Answer to the Complaint was filed, it was disclosed that the proper name of the defendant herein is "Litchford & Christopher, P. A." The Trustee moved to appropriately amend his pleadings, which motion was granted without opposition by order entered September 25, 2009. Therefore, the Complaint has proceeded against the proper defendant.

7052.

## I. Procedural History

Bay Vista of Virginia, Inc. ("Bay Vista"), commenced this Chapter 7 case by the filing of

a voluntary petition on January 23, 2007 (the "Petition Date"), in the United States Bankruptcy

Court for the Middle District of Florida (the "Florida Bankruptcy Court"), being designated as Case

No. 07-00527-MGW.  By an order entered June 6, 2007, the Florida Bankruptcy Court transferred

venue of this Chapter 7 case to this Court, whereupon the Trustee was appointed to serve as Chapter

7 trustee in the place of the Chapter 7 trustee appointed by the Florida Bankruptcy Court.

### A. The Complaint of the Trustee

On August 25, 2008, the Trustee filed the instant Complaint.  After asserting his

jurisdictional and venue allegations in his Complaint, the Trustee alleges, in pertinent part, as

follows:

"9.  Prior to the commencement of this chapter 7 case, Bay Vista transferred $100,000.00

cash (the 'Transferred Funds') to Monarch Bank ('Monarch') by means of a check dated April 20,

2005."  Complaint ¶ 9.[2]

"10.  Monarch immediately remitted such Transferred Funds to the law firm of Kaufman &

Canoles, P.C. ('[Kaufman & Canoles]') by means of a counter check."  *Id.* ¶ 10.

"11. [Kaufman & Canoles] deposited the Transferred Funds into its SunTrust Bank fiduciary

account, designated for the matter of 'Winner Metals of Florida, LLC re: Hung-Lin Wu.'" *Id.* ¶ 11.

"12.  Over the ensuing three weeks, [Kaufman & Canoles] disbursed the Transferred Funds

to [Litchford] by way of a $25,000.00 wire transfer on April 25, 2005, followed by the issuance of

---

[2]  A copy of the referenced check was attached as Exhibit 1 to the Complaint.

2

three $25,000.00 trust checks on April 27, May 4, and May 11, 2005." *Id.* ¶ 12.[3]

"13.  The stated purpose of the foregoing disbursement to [Litchford] of the Transferred Funds was for payment of services rendered by [Litchford] on account of Winner Metals of Florida, LLC ('[Winner Metals]')." *Id.* ¶ 13.

"14.  Bay Vista was not itself obligated to [Litchford] on account of [Winner Metals], and [Litchford] has never provided legal services nor any other thing of value to Bay Vista in consideration for the foregoing disbursements of the Transferred Funds." *Id.* ¶ 14.

"16.  As of April 20, 2005, the Transferred Funds belonged to Bay Vista." *Id.* ¶ 16.

"17.  By its payment to Monarch of the Transferred Funds, Bay Vista effected a 'transfer' within the meaning of 11 U.S.C. § 101(54)." *Id.* ¶ 17.

"18.  Both Monarch and [Kaufman & Canoles] acted as 'conduits' with respect to the ultimate disbursement of the Transferred Funds to [Litchford], such that [Litchford] is properly considered the 'initial transferee' of the Transferred Funds within the meaning of 11 U.S.C. § 550(a)(1)." *Id.* ¶ 18.

"19.  Bay Vista's transfer to [Litchford] (via Monarch and [Kaufman & Canoles]) of the Transferred Funds occurred within two (2) years of the Petition Date." *Id.* ¶ 19.

"20.  Bay Vista had no legal obligation to [Litchford] with regard to payment of any debt(s) that may have been due to [Litchford] on account of [Winner Metals]." *Id.* ¶ 20.

"21.  Bay Vista accordingly received no value, or alternatively received less than reasonably equivalent value, in exchange for its transfer to [Litchford] of the Transferred Funds." *Id.* ¶ 21.

---

[3]  A copy of the Kaufman & Canoles trust statement reflecting the referenced disbursements of the Transferred Funds to Litchford was attached as Exhibit 2 to the Complaint.

3

"22.  Bay Vista was insolvent, or became insolvent, as of the date such transfer occurred."
*Id*. ¶ 22.

"23.  Alternatively, as of April 20, 2005, Bay Vista was engaged or about to become engaged in business transactions for which is [*sic*] was unreasonably undercapitalized."  *Id.* ¶ 23.

"24.  Alternatively, Bay Vista, by and through its principal, Mr. Stanley F.C. Tseng, transferred the Transferred Funds to [Litchford] with the intention or belief that Bay Vista had incurred or was about to incur debts beyond its ability to pay."  *Id.* ¶ 24.

"25.  [The Trustee], in his capacity as Chapter 7 trustee for the Debtor, is thus empowered to recover from [Litchford] the Transferred Funds, or their value, pursuant to 11 U.S.C. §§ 548(a)(1) and 550(a)."  *Id.* ¶ 25.

Based upon these allegations, the Trustee prays for entry of an order awarding judgment against Litchford in the amount of $100,000.00.

### B.  The Answer and Affirmative Defenses of Litchford

Litchford filed its answer to the Complaint on September 29, 2008 ("Answer").  The Answer admitted the jurisdictional and venue allegations of the Complaint and denied the remaining allegations with the exception of its admission that the alleged transfer did take place within two years of the date of the filing of the bankruptcy petition by Bay Vista.  The Answer also raised extensive affirmative defenses.  In support of these defenses, Litchford made a number of factual allegations:

"1.  In May 2002, Hung-Lin Wu and Wu Trust (collectively, 'Wu')[4] filed a massive lawsuit

---

[4]  Hung-Lin Wu and the Wu Trust are also collectively referred to in this Memorandum Opinion as the "Wu Parties."

4

in Tampa, Florida State Circuit Court (the 'Tampa Lawsuit') against Stanley Tseng ('Mr. Tseng')

and all of his business venture entities, except those relating to his restaurants and retirement homes.

The defendants in the Tampa Lawsuit were Mr. Tseng, Tseng Trust I, Tseng Trust II, Winner Metals

of Florida, LLC, Ft. Worth Properties, Inc., United Winner Metals, Inc., Chesapeake West Terminal,

Inc., LST, Inc., and Winner Trading Company of America Ltd.  Wu subsequently added another

entity of Mr. Tseng's as a defendant, Export Metals, LLC."  Answer, at 3.

"2.  Wu's claims arose out of a failed scrap metal business he entered into with Mr. Tseng

in Tampa, Florida.  Mr. Tseng and all of the defendants in the Tampa Lawsuit resided and did

business in Virginia Beach, Virginia, with the exception of Winner Metals of Florida, LLC, which

was the legal entity owning the failed scrap metal business in Tampa.  In the Tampa Lawsuit, Wu

alleged that all of the entities that were defendants in the Tampa Lawsuit were alter egos and/or mere

instrumentalities of Mr. Tseng.  Wu supported these allegations with claims that Mr. Tseng

transferred millions of dollars between these entities on thousands of occasions without any

legitimate business purpose over a period of several years.  Wu alleged various counts against Mr.

Tseng, including fraud, and sought over $10 million in damages from all defendants."  *Id.*

"3.  Mr. Tseng and his many business ventures and entities were long-term clients of the

Norfolk, Virginia-based law firm of Kaufman & Canoles, and specifically senior shareholder Robert

C. Goodman, Jr. . . . [Kaufman & Canoles] made the referral of the Tampa Litigation to [Litchford]

and remained actively involved in the strategy and defense of the case."  *Id*. at 3-4.

"4.  Wu aggressively litigated the Tampa Lawsuit over a period of 3 years which resulted in

more than $1 million being expended by Mr. Tseng and the other defendants in the Tampa Litigation

for [Litchford] attorneys' fees and costs.  Mr. Tseng was chronically delinquent in paying the

5

defense costs to [Litchford] because of what he and [Kaufman & Canoles] represented as cash flow problems.   In several instances, [Litchford] would indicate its intention to withdraw from representation to Mr. Tseng and [Kaufman & Canoles] if payment arrangements were not made. In each of these instances, [Kaufman & Canoles] would arrange for Mr. Tseng or one of the defendants in the Tampa Litigation to pay enough of the outstanding sums so that [Litchford] would stay in the case.   [Litchford] was careful to accept funds only from Mr. Tseng or some other defendant to the Tampa Litigation with the exception of Winner Metals, which was still owned 50% by Wu Trust."  *Id*. at 4.

"5.  By April of 2005, Mr. Tseng owed [Litchford] over $200,000 in unpaid attorneys' fees and costs, and despite repeated promises, payment was not forthcoming because Mr. Tseng claimed he had cash flow problems.   With a significant multi-week trial looming with additional sums requiring to be spent in the case very quickly, [Litchford] notified Mr. Tseng that it would withdraw from the case unless paid immediately and copied [Kaufman & Canoles] on the correspondence. In response, [Kaufman & Canoles] contacted [Litchford] and represented that [Kaufman & Canoles] was handling the closing of a deal with Mr. Tseng in Asia and that Mr. Tseng would be personally receiving $100,000 at the closing, to happen in one month's time.   [Kaufman & Canoles] offered to make sure the $100,000 would be paid from the closing to [Litchford] directly if [Litchford] would stay on as trial counsel in the Tampa Litigation.   [Litchford] declined because it could not wait a month, and it was too little money to be paid too far in the future given the imminent trial." *Id*.

"6.  In response, [Kaufman & Canoles] represented to [Litchford] that it was so certain Mr. Tseng would be receiving the $100,000 sum in a month's time through a deal it was handling, that

[Kaufman & Canoles] itself would pay [Litchford] with its own money in 4 installments of $25,000 each, and then [Kaufman & Canoles] would reimburse itself from Mr. Tseng's $100,000 at the closing.  Relying on these representations, [Litchford] remained as trial counsel in the Tampa Litigation.  [Kaufman & Canoles] caused a total of $100,000 to be paid to [Litchford] in the upcoming month." *Id*. at 5.

"7.  At the ultimate trial of the Tampa Litigation in May of 2005, Wu prevailed completely and a fraud judgment was entered against Mr. Tseng for more than $11 million.  Wu also prevailed on his claims that the entity defendants were all alter egos and mere instrumentalities of Mr. Tseng, so a substantial portion of this judgment was entered against them jointly and severally as well.  This was based in large part on the extensive co-mingling of funds between these entities that Wu claimed, and proved, was Mr. Tseng's hallmark in business." *Id*.

"8.  During the course of the Tampa Litigation, Mr. Tseng formed a new entity in Virginia called Bay Vista. . . .  During the course of the Tampa Litigation, upon information and belief, Mr. Tseng transferred real property from Tseng Trust II to Bay Vista for which Tseng Trust II did not receive reasonably equivalent value or consideration, and/or for which Tseng Trust II, Mr. Tseng and/or alter ego entity or entities received an ownership interest in return.  Upon information and belief, Bay Vista was initially capitalized by funds transferred from Tseng Trust II and/or other entities owned and controlled by Mr. Tseng for which none received reasonably equivalent value or consideration, and/or for which Tseng Trust II, Mr. Tseng and/or alter ego entity or entities received an ownership interest in return.  Upon information and belief, Mr. Tseng treated bank accounts of Bay Vista as his own, as he did all of the other entities he owned or controlled.  Upon information and belief, the only cash or funds Bay Vista ever had in its accounts were deposits from

7

third parties or funds belonging to or originating with Mr. Tseng, Tseng Trust II, or an alter ego or mere instrumentality of Mr. Tseng." *Id.* at 5-6.

"9. After the judgment in the Tampa Litigation became final, Wu domesticated it in Virginia and undertook aggressive collection efforts.  Part of its actions were to cause the United States District Court of the Eastern District of Virginia to declare as void the transfer from Tseng Trust II to Bay Vista of certain real property which was [the] heart of the Bay Vista development project. By entry of a consent order, the District Court declared as void the February 23, 2005, transfer from Tseng Trust II to Bay Vista." *Id*. at 6.

Founded upon these assertions, Litchford sets forth a number of Affirmative Defenses:

1.  "Bay Vista never had ownership in the $100,000 as all funds received by Bay Vista were either deposits, to be held in escrow for condominium purchasers, or were loans from other Tseng entities." *Id*.

2.  "Bay Vista was an alter ego and/or mere instrumentality of Mr. Tseng, Tseng Trust II, and/or any or all of the other defendants in the Tampa Litigation.  Therefore, the funds transferred are not recoverable as Bay Vista received reasonably equivalent value by the defense by [Litchford] of Tseng and his related entities, including Tseng Trust II, in the Tampa Litigation." *Id*.

3.  "The funds received into the [Kaufman & Canoles] account ledger attached to the Plaintiff's Complaint as Exhibit 'B' were not the same as the $100,000 identified in the Complaint because the check numbers do not match and the delay in disbursement does not suggest receipt of a cashier's check.  Therefore, the $100,000 ultimately received by [Litchford] did not originate in any account owned or controlled by Bay Vista and are not recoverable in this action." *Id*. at 6-7.

4.  "[Litchford] is a mediate or immediate transferee under 11 U.S.C. Section 550(b) who

took the $100,000 from [Kaufman & Canoles] (i) for value in exchange for attorneys' fees and costs

due and owing from Mr. Tseng and the other defendants in the Tampa Litigation; (ii) in good faith

based on what was owed and the representations made by Mr. Tseng and [Kaufman & Canoles]; and

(iii) without any sort of knowledge of the potential voidability of the transfer." *Id*. at 7.

5. "Bay Vista received reasonably equivalent value on account of the transfer that is at issue

in the Trustee's Complaint." *Id*. at 8.[5]

C. Summary Judgment Motions

Cross-motions for summary judgment were filed by the Trustee and Litchford, both of which

were denied by this Court at a hearing held on October 20, 2009, and the matter proceeded to the

trial conducted by this Court on February 22, 2010.[6]

---

[5] Subsequent to the filing of the Answer, the Trustee moved for an order disqualifying Karen M. Crowley, Esquire, from serving as counsel for Litchford in this adversary proceeding ("Motion to Disqualify"). By an order entered on January 28, 2009, the Motion to Disqualify was denied on the condition certain waivers were furnished to the Court. Such waivers were not supplied; however, a Motion to Substitute David A. Greer as counsel for Litchford was filed and granted by an order entered by this Court on January 30, 2009.

[6] The trial in this matter was originally scheduled to be held on October 20, 2009. The Trustee filed his Motion for Summary Judgment on September 21, 2009. On September 24, 2009, the Trustee filed a Motion in Limine. On September 28, 2009, Kaufman & Canoles filed a Motion to Partially Quash a Subpoena ("Motion to Quash") directed to the firm. A hearing was held on September 30, 2009, on the Motion Limine and Motion to Quash. The Court granted in part and denied in part the Motion to Quash. At the hearing, counsel for Litchford informed the Court that he would be filing a Cross-Motion for Summary Judgment. As a result of the pending summary judgment motions, the Court determined that it was appropriate to schedule a hearing on the summary judgment motions for October 20, 2009, the date previously established for the trial. The Court continued the hearing on the Motion in Limine to the date established for the trial; however, the parties resolved that motion prior to the commencement of the trial.

## II. Findings of Fact

### A. The Stipulation

The Trustee and Litchford entered into an extensive Stipulation.[7]  The parties further stipulated that the documents referenced[8] in relation to the stipulations could "be introduced into evidence without necessity of additional authentication and subject only to objections relating to relevance and probative worth."  Stipulation, at 1.[9]

"1.  Bay Vista of Virginia, Inc. ('Bay Vista' or 'Debtor') is a Virginia corporation which is now a debtor in a Chapter 7 bankruptcy case; Tom C. Smith, Jr., was appointed and serves as Chapter 7 Trustee.  Bay Vista's principal place of business was located in Virginia Beach, Virginia. Prior to the commencement of this Chapter 7 case, Stanley F.C. Tseng ('Mr. Tseng') was Bay Vista's sole officer and director.  Mr. Tseng's whereabouts are unknown and he is not available for service of process for subpoenas."  *Id*. at 1-2.

"2.  Mr. Tseng formed Bay Vista, Inc., in Virginia in November of 2004, issued one

---

[7]  The Stipulation was filed on Sunday, February 21, 2010, at 7:13 p.m.  Accordingly, the Court was unable to conduct more than a cursory review of the extensive Stipulation prior to conducting the trial on Monday, February 22, 2010.  The Pretrial Order entered in this proceeding on October 27, 2009, sets forth the following: "All Stipulations of Fact are encouraged and shall be filed at least five (5) business days prior to trial."

[8]  The exhibits are referenced within brackets in the original text of the Stipulation.

[9]  At the commencement of this proceeding, counsel for the Trustee presented to the Court that the parties had stipulated to many of the proposed exhibits.  Among that list were the exhibits set forth as stipulated in the written Stipulation filed prior to the trial.  In addition, counsel for the Trustee announced that the parties had stipulated to Plaintiff's Exhibit 19 and Defendant's Exhibits G and W.  The Court has examined in detail all of the stipulated exhibits and those that were admitted but not stipulated, and they are discussed *infra* to the extent the documents provide information relevant and probative to the elements required to be proven under 11 U.S.C. § 548.  Those exhibits that are not discussed have been determined to be not probative of the statutory requirements discussed in Section IV.  *See also* fn. 29, *infra*.

certificate of stock to himself, and served as its president; Kay A. Oliver served as its secretary at one time. [Plaintiff's Exhibits 21, 22, 23]. By Deed dated February 23, 2005, he caused one of his companies, Tseng Trust Agreement Number 2 ('Tseng Trust 2'), to convey to Bay Vista, Inc., the real property known as 3800 DuPont Circle ('Property'), land upon which Tseng planned to build a condominium complex. [Plaintiff's Exhibit 24; Defendant's Exhibit U]. Tseng Trust 2 had acquired that land in October, 1989. After October, 2005, Mr. Wu took over the company, and the company's name was changed from Bay Vista, Inc., to Bay Vista of Virginia, Inc." *Id.* at 2.

"3. At times relevant to these proceedings, Mr. Tseng was principal of several other companies, including the following: Tseng Trust I, Tseng Trust II, Winner Metals Florida, LLC, Forth [*sic*] Worth Properties, Inc., United Winner Metals, Inc., Chesapeake West Terminal, Inc., LST, Inc., Winner Trading Company of America, LTD, and Export Metals, LLC. Each of the foregoing Tseng-affiliated companies was named as a defendant in a law suit filed in Tampa, Florida ('Tampa Lawsuit') by Hung-Lin Wu and Wu Trust (collectively 'Wu') as plaintiffs. Defendant Litchford represented Mr. Tseng and the other defendants ('Tampa Defendants') in the Tampa Lawsuit. Bay Vista was not a defendant in the Tampa Lawsuit." *Id*.

"4. Mr. Tseng and his business ventures and entities, including the Tampa Defendants and including Bay Vista, were clients of the Norfolk-based law firm of Kaufman & Canoles, P.C. ('[Kaufman & Canoles]'), and particularly senior shareholder Robert C. Goodman, Jr. [Kaufman & Canoles] referred the Tampa Lawsuit to [Litchford] for handling." *Id*. at 2-3.

"5. Wu aggressively litigated the Tampa Lawsuit over a period of three years, as a result of which Mr. Tseng and the other Tampa Defendants paid to [Litchford] a total of $1,088,300.85 in attorneys' fees, interest and costs. Mr. Tseng was chronically delinquent in paying the invoices

11

issued by [Litchford].  Mr. Tseng and [Kaufman & Canoles] represented to [Litchford] that Tseng and his entities were experiencing cash flow problems.  In several instances, [Litchford] would indicate its intention to withdraw from representing Mr. Tseng and the other defendants unless payments were made." *Id*. at 3.

"6.  Tseng was known by [Kaufman & Canoles] and by [Litchford] often to borrow or loan money, or otherwise transfer debt and assets, among his various business entities.  For example, among the counts included by Wu in the Tampa Lawsuit were allegations that Mr. Tseng had inappropriately transferred money and assets among his various companies in order to escape liability to Wu." *Id*.

"7.  In 2005, Tseng maintained a bank account at Monarch Bank as Account No. 100257476, shown in the Monarch Bank system as 'Bayvista Inc.'" *Id*.

"8.  During the month of April, 2005, the Monarch Bank account started with a balance of $240,118.13.  Three deposits were made into the account, totaling $192,500.00, including a single deposit on April 19, 2005, for $177,500.00.  During the same month, checks were written on the account totaling $340,000.00, including checks totaling $150,000, made payable to Mr. Tseng or the Tampa Defendants.  [Plaintiff's Exhibit 2; Defendant's Exhibit S].  One check, dated April 20, 2005, and numbered 1019, was made payable to Monarch Bank in the amount of $100,000.00 and was signed by Mr. Tseng.  [Plaintiff's Exhibit 1; Defendant's Exhibit R]." *Id*. at 3-4.

"9.  Monarch Bank issued a cashier's check in the amount of $100,000.00 on April 20, 2005, made payable to the order of 'Kaufman & Canoles' (the 'Cashier's Check').  The memo line on the check was blank, and the check stub issued with the cashier's check indicated as 'transaction description' the words 'over-counter check.'  [Plaintiff's Exhibit 3; Defendant's Exhibit E]." *Id*. at

12

4.

"10.  [Kaufman & Canoles] deposited the Cashier's Check into its SunTrust bank account ending in the number 3471, which is one of that law firm's trust accounts.  [Kaufman & Canoles] trust accounts are used for the deposit and disbursement of money belonging to others, typically clients.  Money in that account is held 'in trust' for a client and is subject to the client's control and direction as to its use.  [Plaintiff's Exhibit 7; Defendant's Exhibits F, J]."  *Id*.

"11.  [Kaufman & Canoles], in its forms for processing that account, noted that the $100,000.00 payment pertained to 'file number 0070495' and showed Mr. Goodman's initials as the 'attorney/secretary' involved in the deposit.  The payor description showed 'Monarch Bank.'"  *Id*.

"12.  According to the [Kaufman & Canoles] trust report, the funds were identified to 'Tseng Stan 005831,' which was Mr. Tseng's 'client number' at [Kaufman & Canoles]'s file system and to '0070495 Winner Medals of Florida, LLC Re: Hung-Lin Wu,' which was [Kaufman & Canoles]'s matter designation for the Tampa Lawsuit.  A bookkeeper at [Kaufman & Canoles] named 'Lori A. Peterson' was shown as the operator for the transaction, and the transaction type was described as 'Payment.'  [Plaintiff's Exhibit 6; Defendant's Exhibits H, I.]."  *Id*.

"13.  Mr. Tseng was the person who typically communicated with [Kaufman & Canoles] about his own and his companies' affairs.  Although [Kaufman & Canoles] knew that Tseng had many corporate entities under his control, it typically treated all of the transactions from Mr. Tseng as being under his name.  In April of 2005, [Kaufman & Canoles] did not have separate matters set up in its trust account or filing system for any Tseng entities, including Bay Vista, other than '0070495 Winner Medals of Florida, LLC Re: Hung-Lin Wu.'  [Defendant's Exhibits O, Q]."  *Id*. at 5.

13

"14.    Mr. Tseng sent the $100,000.00 cashier's check to [Kaufman & Canoles] by undetermined means of delivery, and he directed Mr. Goodman to use the funds to pay [Litchford]'s outstanding legal bills.  No one at [Kaufman & Canoles] recalls exactly what Mr. Tseng said, and there were no written instructions.  Mr. Goodman had the funds placed in the client trust account under the matter name described above.  [Kaufman & Canoles] did not open an account in its client trust account for Bay Vista, Inc."  *Id*.

"15.    Mr. Goodman directed his accounting department to issue a check payable to [Litchford] in the amount of $25,000.00 on or about April 22, 2005.  He sent [Litchford] an email with a letter dated April 22, 2005, attached, concerning the payment, and a copy of the check. [Plaintiff's Exhibit 8; Defendant's Exhibits B, C].  However, Mr. Goodman did not mail the letter and check and instead, on April 25, 2005, directed [Kaufman & Canoles]'s accounting department to void that check and, instead, to wire $25,000.00 to [Litchford].  [Kaufman & Canoles] made this wire transfer.  [Plaintiff's Exhibit 9; Defendant's Exhibit K]."  *Id*.

"16.    Thereafter, Mr. Goodman separately directed [Kaufman & Canoles]'s accounting department, on three separate times, to send three additional checks of $25,000.00 each to [Litchford], and, pursuant to these directions, [Kaufman & Canoles] issued checks on April 27, 2005, May 4, 2005, and May 11, 2005.[10]  [Plaintiff's Exhibits 10, 11, 12; Defendant's Exhibits D, L]. These four $25,000.00 payments from the [Kaufman & Canoles] trust account, made on Mr. Tseng's direction, are the funds which the Trustee now seeks to recover from [Litchford]."  *Id*. at 5-6.

---

[10]  Collectively, the four transfers made by Kaufman & Canoles to Litchford between April 22, 2005, and May 11, 2005, are hereinafter referred to as the "Transfers."

"17. [Litchford] accepted the foregoing funds in payment of a portion of its fees, interest and costs then owed to it by the Tampa Defendants with respect to the Tampa Lawsuit."  *Id*. at 6.

"18.  In January, 2005, the Monarch Bank account had a balance of $240,118.13, and the beginning monthly balances of the account were as follows for 2005:

| | |
|---|---|
| January | $240,118.13 |
| February | $225,118.13 |
| March | $240,118.13 |
| April | $240,118.13 |
| May | $ 92,618.13 |
| June | $ 56,117.13 |
| July | $ 56,081.13 |
| August | $ 56,872.36 |
| September | $ 56,838.76 |
| October | $135,000.00." |

*Id*.

"19.  In October, 2005, $45,000.00 was deposited into the account.  Mr. Tseng wrote a check to himself for $15,000.00 and one to 'Leading Edge Realty' for $164,916.40, closing the account. [Defendant's Exhibit CC]."  *Id*.

"20.  Monarch Bank also held a money market account, number 100278308, in the name of 'Bayvista, Inc.'  It had a starting balance of $75,000.00 on June 10, 2005.  It accumulated interest but had no other activity until September 20, 2005, when $15,000.00 was deposited and $90,569.03 was withdrawn, closing the account.  One [*sic*] June 9, 2005, Bay Vista pledged this account to

Monarch Bank as security for a $35,000.00 loan.  On or about May 25, 2005, Monarch Bank published a Stand-By Letter of Credit for $35,000.00 for the benefit of Heartland Payment Systems, Inc., on account of Bay Vista.  [Defendant's Exhibit DD]."  *Id.*

"21.  Prior to Bay Vista's acquisition of the Property, Tseng Trust 2 had granted three deed-of-trust liens in favor of F. Wayne McLeskey and McLeskey and Associates, LLC (collectively, 'McLeskey'), securing advances up to the stated principal amounts of $960,000.00, $800,000.00 and $600,000.00.  [Plaintiff's Exhibits 26, 27, 28].  Following its acquisition of the Property, on or about June 20, 2005, Bay Vista granted to McLeskey and [*sic*] additional deed-of-trust lien securing advances up to the stated principal amount of $1,000,000.00.  [Plaintiff's Exhibit 29]."  *Id.* at 7.[11]

"22.  By Commitment Letter dated February 23, 2005, Bay Vista agreed to pay S.B. Ballard Construction Company ('SBBCC') for pre-construction site items not to exceed $374,800.00.  [Plaintiff's Exhibit 32].  On February 28, 2005, SBBCC issued its initial application for payment to Bay Vista in the amount of $95,981.00 for pre-construction site work and permitting services as shown on the application.  [Plaintiff's Exhibit 34, Defendant's Exhibit V].  It submitted another application on March 31, 2005, for $152,623.  On June 10, 2005, SBBCC requested an additional draw of $196,356.85.  It submitted another application dated August 9, 2005, for $233,897, showing previous certificates of payment of [$]196,356.58.  [Defendant's Exhibit X]."  *Id.*

"23.  On October 6, 2005, McLeskey caused the Property to be sold at foreclosure by reason of the default of Bay Vista.  The final amount bid for the Property was $5,000,000.00, made by McLeskey through an affiliated company.  [Defendant's Exhibit BB].  The Commissioner of

---

[11]  The deeds of trust as well as the associated notes are referred to herein as the "McLeskey Deeds of Trust" and the "McLeskey Notes," respectively.

16

Accounts initially approved payment of $4,123,018.68 for real estate taxes, sale expenses and the aggregate payoff due to McLeskey, leaving a stated surplus in the amount of $876,981.32. Mr. Smith has disputed the amount claimed by McLeskey in its foreclosure payoff, which is the subject of a separate adversary proceeding pending before this Court – APN 08-7046-SCS." *Id*. at 7-8.

### B. The Evidence at Trial

### 1. The Testimonial Evidence

The testimonial evidence adduced at trial adds little to the Stipulation and the documentary evidence. Accordingly, a compendious recitation of the trial testimony suffices. Robert C. Goodman, Jr. ("Goodman"), an attorney at Kaufman & Canoles, served as counsel for Tseng and his various entities and was Tseng's principal contact with the firm. He described the Florida litigation, the retention of Litchford to represent the Tseng entities therein, and the circumstances concerning the Transfers by Kaufman & Canoles to Litchford. Transcript of February 22, 2010, trial, at 24-33 (hereinafter "Tr."). Goodman did not participate in nor have any knowledge concerning the circumstances of the transmission of the monies from Tseng to Kaufman & Canoles; he also could not enlighten as to the ultimate source thereof. *Id*. at 28, 40-42. Paul K. Campsen ("Campsen"), also an attorney at Kaufman & Canoles, testified that he was indirectly involved in the transmission of the monies to Litchford. He advised Goodman as to his opinion regarding how the transfer of funds to Litchford should be structured so as to avoid Kaufman & Canoles becoming liable for Tseng's legal fees owed to Litchford. *Id*. at 44-47. Campsen had no knowledge as to the source of the monies forwarded by Kaufman & Canoles to Litchford. *Id*. at 47.

Donald Lee McKnight ("McKnight"), a commercial real estate appraiser, testified as to the appraisal of the property he conducted on the property owned by Bay Vista located at 3800 DuPont

Circle, Virginia Beach, Virginia ("Property").  McKnight originally appraised the Property in

August 2006 at the request of an attorney for Mr. Wu.  McKnight was retained to appraise the

Property as of October 6, 2005, which he characterized as a "retrospective" appraisal.  *Id*. at 51-52.

McKnight's appraisal of the Property performed for Mr. Wu as of October 6, 2005, was

$2,250,000.00 ("Original Appraisal").  *Id*. at 53; Plaintiff's Exhibit 31, Retrospective Appraisal of

Property dated August 4, 2006.  Subsequently, McKnight was engaged by the Trustee to appraise

the Property as of April 25, 2005, and May 11, 2005.  Tr. at 53.  McKnight testified that, as of April

25, 2005, his opinion of value for the Property was $2,045,100.00, and, as of May 11, 2005, his

opinion of the market value of the Property was $2,064,500.00.  *Id*. at 56-57.  McKnight's appraisal

for the Trustee ("Second Appraisal") was founded upon the Original Appraisal.  McKnight's Second

Appraisal valued only the raw land which constituted the Property and gave no value to any then-

existing improvements thereon.  *Id*. at 61; *see also* Plaintiff's Exhibit 31.  McKnight calculated these

values by taking the value arrived at in his Original Appraisal and, utilizing an assumption that raw

land in Virginia Beach, Virginia, in the relevant time frame was increasing in value at the rate of

twenty percent (20%) per annum, reduced the earlier determined October 2005 value by a factor of

.9101 for April 2005 and .9189 for the May 11 appraisal.  Tr. at 60-61.

The Trustee testified next, relating the history of his involvement as trustee in this

bankruptcy case.  *Id*. at 63-67.  The Trustee believes that Bay Vista owned only the Property, *id*. at

71, but his ability to investigate the existence of any assets of Bay Vista or Tseng has been hampered

by the lack of availability of Tseng.  *Id*. at 111-13.  The Trustee identified a document entitled "First

Account of Foreclosure Sale Under Deed of Trust," proffered as Plaintiff's Exhibit 36, purporting

to be the accounting for the foreclosure sale ("First Account"), found by the Trustee among the

18

records of Bay Vista, and a letter from Thomas H. Wilson, CPA, to F. Wayne McLeskey, Jr., dated

October 25, 2005, and proffered as Plaintiff's Exhibit 30 ("Wilson Letter"). The Trustee moved the

admission of the First Account and the Wilson Letter, which was objected to by Litchford.[12] *See* Tr.

at 71-86.

The Trustee also identified as his Exhibit 35 a Mechanic's Lien filed by S.B. Ballard

Construction Company ("Ballard") on October 11, 2005, which was also among the records of Bay

Vista, and was admitted over the objection of Litchford. *Id*. at 88-92. The Trustee testified as to

his opinion of the nominal, if any, value of certain causes of action listed in the bankruptcy

schedules of Bay Vista, which schedules were prepared nearly two years after the transfers in

question here and without any input from Tseng or any other employee or principal of Bay Vista.

*Id*. at 93-95, 113-15. The Trustee is without any knowledge as to when the alleged causes of action

in the bankruptcy schedules of Bay Vista may have arisen. *Id*. at 115. Lastly, the Trustee identified

an unsigned commitment letter dated June 21, 2005, from McLeskey to Tseng that addressed a

possible commitment to lend $16,000,000.00 for construction at the Property; this document, marked

as Defendant's Exhibit Z, was admitted without objection. *Id*. at 109-10.

Hal Litchford ("Mr. Litchford") was the sole witness for Litchford. Mr. Litchford is an

attorney and principal of Litchford. *Id*. at 145. His testimony recited the difficulties Litchford

experienced during the Florida litigation in obtaining satisfactory payment of its invoices for

professional services by Tseng, including the return of certain checks tendered to Litchford as

dishonored for insufficient funds. *Id*. at 148-51. With the involvement of Goodman, an arrangement

---

[12] The testimony and argument concerning the admission of the First Account and the
Wilson Letter is more fully set forth in this Court's adjudication of the admission of these
documents in Section III., *infra.*

was agreed to between Tseng and Litchford so Mr. Litchford would continue to participate in the Florida litigation. *Id.* at 151-57. The transfer of the monies to Litchford occurred as described in the Stipulation. *Id.* at 162-67. Litchford did not represent Bay Vista at any time. *Id.* at 167. Mr. Litchford's knowledge of Bay Vista prior to this litigation was limited:

> The only knowledge I had . . . it was pointed out to me that on a trip to Virginia in connection with the litigation in which I represented the Tampa defendants that Mr. Tseng had pointed to a condominium development on the ocean and said this is something I'm doing, but he didn't put any name with it that I remember. I didn't hear the name "Bay Vista" or make that connection until after this action was commenced.

*Id.* at 159. Mr. Litchford admitted the Florida litigation involved, in part, allegations of inter-company transfers by Tseng.. *Id.* at 160-61, 168-70.

## C.  The Motion for Directed Verdict

At the conclusion of the Trustee's evidence, Litchford moved for a directed verdict on the grounds that the evidence of the Trustee failed to establish a *prima facie* case against Litchford. The motion was taken under advisement and is addressed *infra*.

## III.  Determination of Reserved Evidentiary Admissions

In order to reach a conclusion on the Motion for a Directed Verdict of Litchford, the Court must necessarily address the reserved evidentiary admission decisions remaining from the trial of this matter. In this instance, these decisions assume a criticality unusual in bankruptcy proceedings. Litchford has objected to the admission as exhibits the documents that constitute the sole evidence advanced by the Trustee to prove the insolvency element of § 548. Exclusion of these documents would leave the Trustee with no evidence to sustain his burden of proof of this requirement. Accordingly, the Court elected to reserve its decision whether to admit these documents in recognition that, in this instance, the Court's decision to exclude will direct a substantive conclusion

of the merits of this case.

The contested documents are two in number: (1) the "First Account," proffered as Plaintiff's Exhibit 36; and (2) the "Wilson Letter," proffered as Plaintiff's Exhibit 30. Neither William Adam White, the signatory on the First Account, nor Thomas H. Wilson, author of the Wilson Letter, testified at trial. The Trustee attempted to introduce these documents through his own testimony, stating the First Account and the Wilson Letter were found by him among the records of Bay Vista upon his investigation in performance of his official duties as Trustee.

Litchford objected to the admission of the First Account and the Wilson Letter on the basis that the documents are hearsay and not subject to any of the hearsay exceptions found in Federal Rule of Evidence 803. The Trustee agrees the First Account contains hearsay statements but argues the document is admissible under the exceptions contained in Federal Rule of Evidence 803(6), (8), or (14).[13] Litchford also objected to the Wilson Letter on the basis of relevance, arguing that the letter merely contains mathematical calculations and is devoid of evidence as to the amounts advanced under the McLeskey Notes. As to the Wilson Letter, the Trustee countered Litchford's hearsay and relevance arguments by asserting that Mr. Wilson's calculations had to be based upon an amount, and that amount can be established either through the Court's admission into evidence

---

[13] The Trustee seeks admission of the First Account and the Wilson Letter as probative of the determination of the solvency of Bay Vista by the use of statements within these documents that purport to establish the amounts owed to McLeskey and secured by deeds of trust on the Property. Accordingly, the documents are being offered for the truth of the assertions therein as to amounts owed to McLeskey under notes secured by deeds of trust on the Property. As such, the statements as to amounts owed constitute hearsay and are not admissible unless subject to one of the hearsay exceptions contained in Federal Rule of Evidence 803. Federal Rule of Evidence 802 prohibits the admission of hearsay except as provided by the Federal Rules of Evidence, by other rules prescribed by the Supreme Court of the United States pursuant to statutory authority, or by Act of Congress.

21

of the First Account or by subtracting the interest Mr. Wilson calculated to be due and owing on the notes.

At the trial, the Court ruled that the First Account was not admissible under the hearsay exceptions found in Federal Rule of Evidence 803(6) and 803(8) and sustained Litchford's objection to that extent. The Court reserved its ruling as to whether the First Account is admissible under Federal Rule of Evidence 803(14). The Court also took under advisement its ruling as to whether the Wilson Letter was admissible in and relevant to these proceedings. Accordingly, the Court will readdress its conclusions at trial and explore whether these documents are admissible under Federal Rule of Evidence 803(14) or under some other provision of this rule.

## A. The Business Records Exception

The Trustee initially relies upon the so-called "business records" exception to the hearsay exclusion, contending that both the First Account and the Wilson Letter are business records of Bay Vista because he found copies of them among the records of Bay Vista.

The "business records" hearsay exception, found in Federal Rule of Evidence 803(6), provides for the admissibility of a record that would otherwise be inadmissible as hearsay under Federal Rule of Evidence 802:

> (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

22

Fed. R. Evid. 803(6).  Accordingly, "Rule 803(6) states that business records are not excluded under the hearsay rule if they are accompanied by a certification of their custodian or other qualified person asserting (1) that the records were 'made at or near the time by, or from information transmitted by, a person with knowledge'; (2) that they were 'kept in the course of a regularly conducted business activity'; and (3) that 'it was the regular practice of that business activity to make [them].'"  *U.S. v. Santana*, No. 08-4216, 2009 WL 4023540, at *3 (4th Cir. Nov. 23, 2009) (unpublished per curiam decision).

Under the circumstances here this exception does not support the admission of either the First Account or the Wilson Letter.  Illustrative is *Dibraccio v. Raybin* (*In re J.R. Royce, Inc.*), No. 91-24413, 1999 WL 33596531 (Bankr. S.D. Fla. Feb. 24, 1999).  There the bankruptcy trustee filed an adversary complaint for avoidance and turnover under 11 U.S.C. § 544 and Florida law, and after a trial on the merits, the Court found that the transfer of certain real property was a fraudulent transfer.  *Id.* at *1.  The trustee sought to admit an appraisal of the transferred property prepared for the mortgage holder thereupon as a business record exception to the prohibition of hearsay evidence. *Id.* at *2.  The Court determined this document should be properly excluded:

> The Trustee also sought to introduce into evidence an appraisal of the property conducted on July 27, 1990, on behalf of Citibank.  However, the appraiser who prepared the appraisal did not testify, and Mr. Raybin objected to the admission into evidence of the appraisal.  The Trustee sought admission of the appraisal as a business record, Fed. R. Evid. 803(6), and under the residual exceptions of Fed. R. Evid. 807.  The business record exception is not applicable in this case because the appraiser was not an employee of Citibank.

*Id.*  Holding similarly is *Fisher v. Page*, No. 02 C 1588, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002). There a Chapter 7 trustee filed an adversary complaint against the debtor's investors seeking to recover payments made by the debtor as fraudulent conveyances under the Bankruptcy Code and

23

Illinois law. The bankruptcy court excluded a report by an accounting firm, certain business records,

and a Net Cash Report for the debtor because a foundation had not been laid for their introduction.

*Id*. at *6. The District Court concluded the exclusion was sound:

> The Trustee attempted to lay a foundation with his own testimony; but this did not
> satisfy the bankruptcy court because: (1) the Trustee did not have personal
> knowledge of Lake States' business records or the KPMG Report or the Net Cash
> Report and did not assist with their preparation or maintenance, (2) the Trustee did
> not subpoena any former Lake States employees who may have had personal
> knowledge of those documents or who could have laid a foundation for their
> introduction, and (3) the Trustee did not call the author of the KPMG Report or any
> former employee of KPMG to testify about the KPMG Report or the review of the
> business records.
>
> Federal Rule of Evidence 602 provides that "[a] witness may not testify to a
> matter unless evidence is introduced sufficient to support a finding that the witness
> has personal knowledge of the matter. Evidence to prove personal knowledge may,
> but need not, consist of the witness' own testimony." The Trustee admitted that he
> lacked personal knowledge of and did not assist in the preparation or maintenance
> of Lake States' business records, the KPMG Report and the Net Cash Report.
> Pursuant to Rule 602, the Trustee was not, therefore, competent to testify regarding
> these matters and could not lay a foundation for their admission. The fact that the
> Trustee is the statutory successor to the assets, liabilities and records of the Debtors
> does not provide the Trustee with the Debtors' personal knowledge of Lake States'
> business operations or records, and the Trustee has not provided any case law that
> would support this assertion.

*Id.* at *6-7. *See also Latman v. Burdette*, 366 F.3d 774, 787 (9th Cir. 2004) (finding certain bank

account records were inadmissible both due to the lack of personal knowledge by the trustee's

attorney to testify as to the authenticity of the records as required by Federal Rule of Evidence 602

and because "the La Jara account records attached to the Trustee's counsel's declaration were not

properly qualified under the business record exception to the hearsay rule as set forth in Rule 803(6).

To comply with this rule, the Trustee would have to provide specific testimony or a specific

certification that the account records constituted records of regularly conducted activity, as defined

by the rule.  Fed. R. Evid. 803(6).  The Trustee's counsel's declaration does not suffice.  The requisite testimony must come from the custodian of the records or 'other qualified witness.'  The Trustee's counsel is neither."); *Roberts v. Oliver* (*In re Oliver*), 414 B.R. 361, 370 (Bankr. E.D. Tenn. 2009) (finding that, with respect to documents obtained by the trustee in a Rule 2004 examination, "Rule 803(6) does not allow admissibility of the documents because they are not the types of documents kept by the Plaintiff in the course of his regularly conducted business activity, and he has not provided a proper foundation for their admissibility as required by Rule 902(11)."); *Chao v. Lexington Healthcare Group, Inc.* (*In re Lexington Healthcare Group, Inc.*), 335 B.R. 570, 574 (Bankr. D. Del. 2005) ("While the receiver is the custodian of the Debtors' records, it is not the custodian of the records of the Debtors' payroll company or Nationwide.  Those records have not been authenticated.  *See* Fed. R. Evid. 902(11).  The affiant's testimony about the contents of those records is, therefore, inadmissible hearsay.").

While these cases demonstrate that courts often overlap their analysis of the hearsay exception and authentication requirements contained in the Federal Rules of Evidence when determining whether evidence is admissible, it is nonetheless clear what the Trustee must show for the Court to deem the First Account and/or the Wilson Letter admissible under the hearsay exception found in Federal Rule of Evidence 803(6).  First, the Trustee must show that he is competent to testify regarding these documents, as required by Federal Rule of Evidence 602, which requires him to make a showing "sufficient to support a finding that [he] has personal knowledge of the matter." Fed. R. Evid. 602.  He must then properly authenticate or identify the documents as required by Federal Rule of Evidence 901 in a manner "sufficient to support a finding that the matter in question is what its proponent claims;" such requirement is a condition precedent to admissibility of evidence.

25

Fed. R. Evid. 901(a).  Authentication or identification may be shown either with extrinsic evidence

(such as testimony by a witness with knowledge, *see* Fed. R. Evid. 901(b)(1)) or by demonstrating

that the document is one that is self-authenticating in accordance with Federal Rule of Evidence 902.

The Trustee cannot meet his burden under Federal Rule of Evidence 602, as he lacks

personal knowledge as to the authenticity of both the First Account and the Wilson Letter.  The

Trustee testified that he found the documents among Bay Vista's records, but as in the *Fisher* case,

discovery of these documents among the debtor's papers does not suffice to allow the Trustee to lay

an adequate foundation for his testimony regarding the contents of the document and the truth

thereof.  *Fisher*, 2002 WL 31749262, at *7 ("The fact that the Trustee is the statutory successor to

the assets, liabilities and records of the Debtors does not provide the Trustee with the Debtors'

personal knowledge of Lake States' business operations or records, and the Trustee has not provided

any case law that would support this assertion.").  No other witnesses were called by the Trustee to

attempt to establish a foundation for the First Account (such as Mr. White) or the Wilson Letter

(such as Mr. Wilson).  Without authentication of these documents, the Court cannot admit them, and

therefore, the Court's determination that Litchford's objection to these documents should be

sustained was proper.

Additional bases exist to exclude these documents as well.  The Trustee here is not "the

custodian or other qualified witness," whose testimony is required by Federal Rule of Evidence

803(6), of either the First Account or the Wilson Letter, both of which were apparently prepared by

individuals or entities other than Bay Vista, its principal or employees, or by the Trustee.[14]  Further,

---

[14]  The Advisory Committee Notes to the 1974 Amendments to the Federal Rules of
Evidence support this conclusion:

the Trustee failed to show that both documents were "kept in the course of a regularly conducted business activity" by Bay Vista and that "it was the regular practice of [Bay Vista in the course of its] business activity to make" these records.  Accordingly, the Court correctly sustained the objection of Litchford as to the admissibility of these documents under the "business records" exception to the hearsay rule.

### B.  The Public Records Exception

The Trustee also asserts that the First Account and the Wilson Letter are admissible as public records under the hearsay exception incorporated in Federal Rule of Evidence 803(8), which provides for the admission of hearsay documents that are considered to be such documents:

> (8) Public records and reports.  Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual

---

It is the understanding of the committee that the use of the phrase "person with knowledge" is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based.  A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data compilations upon a transmission from a person with knowledge, *e.g.*, in the case of the content of a shipment of goods, upon a report from the company's receiving agent or in the case of a computer printout, upon a report from the company's computer programmer or one who has knowledge of the particular record system.  In short, the scope of the phrase "person with knowledge" is meant to be coterminous with the custodian of the evidence or other qualified witness.  The committee believes this represents the desired rule in light of the complex nature of modern business organizations.

Fed. R. Evid. 803 advisory committee's note.

findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8).  Even assuming that both documents at issue were properly authenticated, the exception found in Rule 803(8) is inapplicable to the Wilson Letter and the First Account.  The Wilson Letter facially appears to be correspondence between two individuals without any public office or duties.  The First Account is signed by William Adam White as a substitute trustee under certain deeds of trust.  The Court is not convinced that the position of a substitute trustee under the provisions of a deed of trust in Virginia constitutes a public office or function.[15]  While a substitute trustee must file certain accountings with the Commissioner of Accounts for the Circuit Court of the municipality where a foreclosure is conducted (*see* Va. Code Ann. § 26-15), there is no facial indication or testimony this First Account was so submitted and accepted or recorded by the Commissioner of Accounts for the Circuit Court of the City of Virginia Beach.  As such, it does not qualify under Federal Rule of Evidence 803(8) as an exception to the hearsay rule, and the Court's determination to that effect at trial was correct.

### C.  The "Affecting An Interest in Property" Exception

The Trustee also advocates that the First Account is admissible under the exception to the hearsay exclusion that permits the admission of a record affecting an interest in property.  Federal Rule of Evidence 803(14) provides:

---

[15]  The Trustee provided no authority to support the proposition that the duties of a trustee or substitute trustee under a deed of trust in Virginia should be deemed equivalent to a public office or function, other than his counsel's statements that trustees under deeds of trust are obligated to perform certain tasks under the Virginia Code.  The Court was unable to locate any statutory or case law or legal commentary interpreting the duties of a trustee or substitute trustee under a deed of trust in Virginia to be equivalent to a public office or function.

(14) Records of documents affecting an interest in property. The record of a document purporting to establish or affect an interest in property, as proof of the content of the original recorded document and its execution and delivery by each person by whom it purports to have been executed, if the record is a record of a public office and an applicable statute authorizes the recording of documents of that kind in that office.

Fed. R. Evid. 803(14).  Even assuming the First Account was properly authenticated, this rule likewise does not afford admission for the First Account as the First Account is not a record of a public office.  As indicated above in the Court's discussion regarding the public records exception to the hearsay rule, there is no facial indication or testimony this First Account was submitted to and accepted or recorded by the Commissioner of Accounts for the Circuit Court of the City of Virginia Beach.[16]  Therefore, the objection to the admission of the First Account by Litchford with regard to the hearsay exception found in subsection 14 of Federal Rule of Evidence 803 should be sustained.

### D.  The Residual Hearsay Exception

Two other hearsay exceptions contained in Federal Rule of Evidence 803 that were not argued by the Trustee to justify admission of the First Account and the Wilson Letter bear examination by this Court to exhaust the possible exceptions that might permit the admission of these documents.  Rule 807 permits the admission of evidence not covered by Federal Rules of Evidence 803 or 804 under certain circumstances:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if

---

[16] To the extent that the Trustee also attempted to introduce the Wilson Letter by utilizing the exception contained in Federal Rule of Evidence 803(14), that argument is also rejected by the Court.  As stated above, the Wilson Letter facially appears to be correspondence between two individuals without any public office or duties; further, it contains no indication (and no testimony was provided) that such document was ever filed with a public office.

the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed. R. Evid. 807. This exception is also unavailing to the Trustee as it does not appear the notice requirements of Rule 807 have been met. As the Fourth Circuit Court of Appeals has recognized:

> Alternatively, American General argues for the first time on appeal that even if the letter did not qualify for admission under any of the specific hearsay exceptions identified in Rules 803 or 804, it was nonetheless admissible under the residual hearsay exception, which governs the admissibility of hearsay statements not covered by those rules. *See* Fed. R. Evid. 807. But Rule 807 permits admission of a statement under this exception only if, *inter alia*, the proponent provides the opposing party proper notice that it will rely on this exception. *Id.* Because American General did not rely on this exception or cite Rule 807 at trial, it obviously failed to provide the required advance notice to Rowland. *See, e.g.*, *Herrick v. Garvey*, 298 F.3d 1184, 1192 n.6 (10th Cir. 2002) (rejecting effort to use the residual hearsay exception on ground that proponent failed to provide adverse party with prior notice of intent to utilize the exception). Accordingly, American General's attempt on appeal to use Rule 807 to justify admission of the letter fails.

*Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 195 (4th Cir. 2003). Here there is no basis to conclude the Trustee provided any notice to Litchford relating to this residual exception, and accordingly, this rule provides no basis for the admission of either the First Account or the Wilson Letter.

    E. The "Statements in Documents Affecting an Interest in Property" Exception

The final evidentiary analysis remaining for the Court to examine is whether Federal Rule of Evidence 803(15) permits the introduction into evidence of the First Account or the Wilson

Letter.  This hearsay exception, also not argued at trial by the Trustee, provides for the admission

of documents as follows:

> (15) Statements in documents affecting an interest in property.  A statement
> contained in a document purporting to establish or affect an interest in property if the
> matter stated was relevant to the purpose of the document, unless dealings with the
> property since the document was made have been inconsistent with the truth of the
> statement or the purport of the document.

Fed. R. Evid. 803(15).  The Committee Notes to the 1972 amendments to this provision of Rule 803

amplify its stated purpose:

> Note to Paragraph (15).  Dispositive documents often contain recitals of fact.  Thus
> a deed purporting to have been executed by an attorney in fact may recite the
> existence of the power of attorney, or a deed may recite that the grantors are all the
> heirs of the last record owner.  Under the rule, these recitals are exempted from the
> hearsay rule.  The circumstances under which dispositive documents are executed
> and the requirement that the recital be germane to the purpose of the document are
> believed to be adequate guarantees of trustworthiness, particularly in view of the
> nonapplicability of the rule if dealings with the property have been inconsistent with
> the document.  The age of the document is of no significance, though in practical
> application the document will most often be an ancient one.  *See* Uniform Rule
> 63(29), Comment.

Fed. R. Evid. 803 advisory committee notes.

Few decisions have addressed Federal Rule of Evidence 803(15).  Judge Martin has explored

the reach of Federal Rule of Evidence 803(15):

> Although there is little case law on this exception to the hearsay rule, the
> "[Cancellation of Indebtedness]" signed by Edward Silverstein meets the
> requirements of the rule.  Documents detailing property interest in stock have been
> admitted under Rule 803(15).  In *United States v. Weinstock*, 863 F. Supp. 1529,
> 1531 (D. Utah 1994), the court entered the affidavit of a deceased man.  The affidavit
> stated that the individual was the owner of shares of stock and that he needed new
> certificates because the old ones had been lost or stolen.  The court, on admitting the
> affidavit, noted that Federal Rule of Evidence 803(15) "should be applied where the
> document is seriously related to a carefully planned transaction." *Weinstock*, 863 F.

Supp. at 1533.  This rationale was reiterated in *Compton v. Davis Oil Co.*, 607 F. Supp. 1221, 1229 (D. Wyo. 1985).  In *Compton*, the issue being litigated was whether a couple who lived together in the 1920s and who was now dead, had been legally married.  The documents were warranty deeds, but were admitted in the case because they stated that the two individuals were husband and wife.  In admitting the document as evidence of the couple's valid marriage, the court noted that:

> Such instruments are executed in relation to serious and carefully planned transactions, and the financial stake in the transaction, plus the obvious reliance upon the truth of statements made in such instruments by third parties are adequate to at least imply that the recitals in such instruments are trustworthy.

*Compton*, 607 F. Supp. at 1229.

In the instant case, the document transferring stock from Edward and Marvin Silverstein to their sister Rita Chase bears every indicia of a carefully planned transaction.  It is not in dispute that Edward agreed that if the siblings were awarded a recovery from the estate, he would compensate Rita one third of $100,000 for the monies she expended on behalf of their father.  (Trial Transcript "Tr." 3:10-20).  The [Cancellation of Indebtedness] is the manifestation of the intended transfer and indicates that Edward believed Marvin was also reimbursing his sister for the debt they owed her.

*Silverstein v. Smith Barney, Inc.*, No. 96 Civ. 8892, 2002 WL 1343748, at *2 (S.D.N.Y. June 18, 2002).  *See also U.S. v. Boulware*, 384 F.3d 794, 807 (9th Cir. 2004) ("Under the plain meaning of Rule 803(15), hearsay statements are admissible if they are contained within a document that affects an interest in property, if the statements are relevant to the purport of the document, and if dealings with the property since the document was made have not been inconsistent with the truth of the statements. . . . Here, the state court judgment meets each of these requirements.") (internal citations omitted); *Silverstein v. Chase*, 260 F.3d 142, 149 (2d Cir. 2001) (finding a cancellation of indebtedness admissible under Rule 803(15) because the document was authenticated and trustworthy, affected an interest in property, and subsequent dealings with the property since the

32

document was formed were consistent with the truth of the statement); *Kelly v. Enbridge (U.S.) Inc.*, No. 07-3245, 2008 WL 2123755, at *7 (C.D. Ill. May 16, 2008) ("Documents affecting interests in real estate are admissible as an exception to the hearsay rule with respect to matters relevant to the purpose of the document."); *U.S. v. Abbey*, No. 06-20286, 2007 WL 216294, at *2 (E.D. Mich. Jan. 25, 2007) (finding certain private documents concerning the values of comparable pieces of land that were generated at land closings to be admissible under Rule 803(15)); *Embs v. Jordan Outdoor Enters., Ltd*, No. 2:03CV895, 2005 WL 2250681, at *4 (S.D. Ohio Sept. 15, 2005) ("The Court finds that the statements regarding [the patent assignment] in the above documents establish or affect an interest in property. . . ."); *U.S. v. Weinstock*, 863 F. Supp. 1529, 1535 (D. Utah 1994) (determining that an affidavit affected an interest in property because of plaintiff's claim that he was the legal and beneficial owner of 35,000 shares of stock and therefore finding the document admissible under Rule 803(15)); *Taylor v. U.S.*, CIV 90-1929, 1993 WL 597379, at *2 (D. Ariz. Sept. 27, 1993) ("As for the settlement documents, the escrow instructions, and the addendum to the escrow instructions, the Court finds that the documents are hearsay under Federal Rule of Evidence 801.  However, the Court finds the documents are admissible hearsay under Rule 803(15) because they are documents purporting to affect an interest in real property.").

Assuming that both documents at issue were properly authenticated, the Court finds that the Wilson Letter does not contain statements "affecting an interest in property" sufficient for this document to be admitted under the hearsay exception found in Rule 803(15).  Instead, the document contains statements regarding the purported payoff amounts of certain notes.  As to the First Account, however, the Court finds that the statements contained therein would be admissible (again, assuming proper authentication and foundation for such) as statements "affecting an interest in

33

property" as it sets forth information regarding the foreclosure sale, including the highest bidder at the sale, the proposed purchase price, and the proposed disbursement of the sale proceeds.

In summary, the Court finds that Plaintiff's Exhibit 36, the First Account, and Plaintiff's Exhibit 30, the Wilson Letter, are inadmissible under the exceptions to the hearsay rule found in subsections (6), (8), (14), and (15) of Federal Rule of Evidence 803 because the Trustee cannot meet his burden under Federal Rule of Evidence 602, as he lacks personal knowledge as to the authenticity of both documents.  No other witnesses were called by the Trustee to attempt to establish a foundation for either document, and without authentication of these documents, the Court cannot admit them.  Therefore, Litchford's objections to these documents should be sustained.  The Court further finds that documents also cannot be admitted under the residual exception to the hearsay rule found in Rule 807 as it does not appear the notice requirements of that rule have been met.[17]  Finally, the Court finds that had proper authentication and foundation been provided, which is not the case, Plaintiff's Exhibit 36, the First Account, would have been admissible as a document containing statements "affecting an interest in property" as set forth in the exception to the hearsay rule in Rule 803(15).[18]

---

[17]  As described *supra* at page 20, the Court recognizes the First Account and the Wilson Letter were the only evidence proffered by the Trustee as to the amounts owed on the McLeskey Notes.  By reason of their exclusion, the Court expressly finds as a matter of fact that there is no proof in this record to establish the amounts owed on the McLeskey Notes at the time of the Transfers.  *See also infra* at page 48.

[18]  As set forth in Section IV.A.2, *infra*, the Court will presume that proper authentication and foundation were provided as to the First Account and that the First Account has been admitted under Federal Rule of Evidence 803(15).

IV.  Conclusions of Law

A.  Section 548: Fraudulent Transfer

The Trustee relies upon § 548 of the Bankruptcy Code in support of his claim against Litchford.  Section 548 of the Bankruptcy Code exists "to preserve 'the debtor's estate for the benefit of its unsecured creditors.'"  *Banks Auto Parts, Inc. v. Banks Invs. I., LC* (*In re Banks Auto Parts, Inc.*), 385 B.R. 142, 153 (Bankr. E.D. Va. 2008) (quoting *Harmon v. First Am. Bank of Md.* (*In re Jeffrey Bigelow Design Group, Inc.*), 956 F.2d 479, 485 (4th Cir. 1992)) (citations omitted).  Judge Catliota has recently examined this section:

> Under Section 548(a)(1)(B)(i), a transfer can only be avoided if the debtor "received less than reasonably equivalent value for such transfer . . ."  For purposes of Section 548, ". . . value means property, or satisfaction or securing of a present or antecedent debt of the debtor . . ."  11 U.S.C. § 548(d)(2)(A).  "[R]easonably equivalent value looks to the consideration actually received by the debtor, not to the value given by the transferee."  *Koch v. Rogers* (*In re Broumas*), 203 B.R. 385, 393 (D. Md. 1996) (citing *Harman v. American Bank of Maryland* (*In re Jeffrey Bigelow Design Group, Inc.*), 956 F.2d 479, 484 (4th Cir. 1992)).

*Whitney v. Newman* (*In re Whitney*), No. 06-14435-TJC, 2007 WL 2230063, at *5 (Bankr. D. Md. July 30, 2007).

> Section 548 of the Bankruptcy Code, in pertinent part, provides:

> (a)(1)  The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> . . . .

35

(B)(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I)  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)  was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III)  intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV)  made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).  "'The burden of proof of establishing the existence of the elements of a voidable transfer under section 548 of the Bankruptcy Code rests on the trustee.  This burden of proof never shifts.'"  *Hovis v. Ducate* (*In re Ducate*), 369 B.R. 251, 262 (Bankr. D.S.C. 2007) (quoting 5-548 COLLIER ON BANKRUPTCY ¶ 548.10 (15th ed. rev.)).  *See also Gates v. Dalton* (*In re Dalton*), Adv. No. 82-0337-R, 1984 WL 589686, at *2 (Bankr. E.D. Va. Oct. 18, 1994)).  The Trustee must prove the elements of § 548 by a preponderance of the evidence.  *See id.*; *Ivey v. Crown Mem'l Park, LLC* (*In re Lee Memory Gardens, Inc.*), Adv. No. 04-9025, 2006 WL 996567, at *2 (Bankr. E.D.N.C. Apr. 14, 2006).

36

Section 550 of the Bankruptcy Code sets forth from whom such a transfer may be recovered:

(a)  Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

> (1)  the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2)  any immediate or mediate transferee of such initial transferee.

(b)  The trustee may not recover under section (a)(2) of this section from—

> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

> (2)  any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a)-(b).  Accordingly, "[u]nder 11 U.S.C. § 548(a)(1)(B), a transfer by Debtor of any interest in property may be avoided if two elements are satisfied.  First, Debtor must have 'received less than a reasonably equivalent value in exchange for such transfer.' . . . Second, the transfer must either have been made while Debtor was insolvent, or have itself rendered Debtor insolvent." *Anderson & Assocs. v. S. Textile Knitters de Honduras Sewing Inc.* (*In re S. Textile Knitters*), 65 F. App'x 426, 436 (4th Cir. 2003) (unpublished) (citing 11 U.S.C. § 548(a)(1)(B)).

### 1.  Transfer of Property of the Debtor

The initial element that must be proven by the Trustee to sustain a claim under § 548 of the Bankruptcy Code is that the property transferred is an "interest of the debtor in property."  11 U.S.C.

§ 548(a)(1). Litchford believes the Trustee has failed in his proof that the Transfers were made with property of Bay Vista. Litchford specifically asserts that the Trustee has not proven the $100,000.00 withdrawn from the Bay Vista account at Monarch Bank was the same funds used to procure the cashier's check that was delivered to Kaufman & Canoles, deposited into an escrow account, and then paid to Litchford in four $25,000.00 increments. As Litchford argues:

> The only evidence that the trustee can argue that the Bay Vista check that came out as a countercheck is the same money as the cashier's check—remember, it was a cashier's check from Monarch Bank to Kaufman & Canoles, not a Bay Vista countercheck. There's a tremendous distinction. But the only thing the trustee can try to argue is they happen to be the same amount of money. . . .
>
> Well, a hundred thousand dollars is about as round a number as a person can get. And the argument that it's the same money just because it happened on the same day is not sufficient to prove—to meet their burden of proof to say that it is the same money.

Tr. at 193. The Trustee believes the evidence here is sufficient to establish the monies of Bay Vista withdrawn from Monarch Bank were the same monies delivered to Kaufman & Canoles in the form of the cashier's check:

> [I]t is not my position that the only thing establishing that that was Bay Vista money was the amount happened to be $100,000. That helps, $100,000, but it also is because that account was named Bay Vista. That transfer from that account happened on the same exact day and it happened under circumstances in which both the defendant and the Kaufman & Canoles witnesses testified they were under an endeavor to try to move money $100,000 to Litchford & Christopher.

Tr. at 203-04. An analysis of the evidence here shows that the Trustee has carried his burden in providing adequate proof the monies withdrawn by Tseng from Monarch Bank are the same monies transferred to Kaufman & Canoles and then to Litchford. The Stipulation establishes that "[a] check, dated April 20, 2005, and numbered 1019, was made payable to Monarch Bank in the amount of

$100,000.00 and was signed by Mr. Tseng.  [Plaintiff's Exhibit 1; Defendant's Exhibit R]."

Stipulation, at 3-4.  This check was paid out of a Monarch Bank account of Bay Vista.  *Id*. at 3.  The

Stipulation further provides that "Monarch Bank issued a cashier's check in the amount of

$100,000.00 on April 20, 2005, made payable to the order of 'Kaufman & Canoles' (the 'Cashier's

Check')."  *Id*. at 4.  The Stipulation goes on to provide: "[Kaufman & Canoles] deposited the

Cashier's Check into its SunTrust bank account ending in the number 3471, which is one of that law

firm's trust accounts."  *Id*. at 4.  Furthermore, "[Kaufman & Canoles], in its forms for processing

that account, noted that the $100,000.00 payment pertained to 'file number 0070495,'" and "Mr.

Tseng sent the $100,000.00 cashier's check to [Kaufman & Canoles] by undetermined means of

delivery, and he directed Mr. Goodman to use the funds to pay [Litchford]'s outstanding legal bills."

*Id*. at 5.  Thereafter, the monies were transferred from the trust account of Kaufman & Canoles to

Litchford, which accepted them.  *Id*. at 5-6.

The purpose of factual stipulations at trial has been recognized by Judge Ellis:

The primary purpose of entering into a stipulation is "to dispense with proof over
matters not in issue, thereby promoting judicial economy at the convenience of the
parties."  *United States v. Montgomery*, 620 F.2d 753, 757 (10th Cir. 1980) (citing
9 J. Wigmore, Evidence §§ 2588-2597 (3d ed.1940)); *see also CDN Inc. v. Kapes*,
197 F.3d 1256, 1258 (9th Cir. 1999) (recognizing that "stipulations serve both
judicial economy and the convenience of the parties").  It has therefore been held
that "[s]tipulations as to facts freely and voluntarily entered into during trial are
equivalent of proof and . . . neither party will be heard to suggest that the facts were
other than as stipulated."  *United States v. Campbell*, 453 F.2d 447, 451 (10th Cir.
1972).  Indeed, courts "enforce stipulations as a general rule, absent circumstances
tending to negate a finding of informed and voluntary assent of a party to the
agreement."  *United States v. McGregor*, 529 F.2d 928, 931 (9th Cir. 1976) (citation
omitted).

*U.S. v. Lentz*, 419 F. Supp. 2d 843, 844-45 (E.D. Va. 2006).

39

The binding effect of a factual stipulation on the parties at trial has been recognized by the

Fourth Circuit Court of Appeals:

> Before the [Administrative Law Judge], the Director clearly stipulated to the findings of fact in the deputy commissioner's award of lifetime benefits. (*See* J.A. at 83 ("[I]f I'm being asked to stipulate to the contents of [the award of benefits] I have no problem with that.").). Therefore, the Director agreed that "as a result of the conditions of coal mine employment [Mr. Richardson] ha[d] contracted a severe chronic respiratory disease diagnosed as coal workers' pneumoconiosis, as that term is defined in the Act and Regulations." (J.A. at 20); *see Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 523 (2d Cir. 1984) ("[A] stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it."). . . . The Director's stipulation and concession are binding on the parties and this court in this appeal. *See Hagan v. McNallen* (*In re McNallen*), 62 F.3d 619, 625 (4th Cir. 1995) (holding that concession before bankruptcy court was binding on appeal); *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (stating that stipulations and admissions are binding on the parties and the court on appeal as well as at trial).

*Richardson v. Director, Office of Workers' Comp. Programs*, 94 F.3d 164, 167 (4th Cir. 1996).

*Accord Henze v. Lambertson*, No. 90-2086, 1991 WL 59717, at *1 (4th Cir. Feb. 22, 1991)

(unpublished per curiam decision) ("[W]e hold that the district court did err in failing to give binding

effect to the parties' stipulation that Betty Henze incurred $6,512.90 in reasonable and necessary

medical expenses.").[19]

---

[19] The legally binding effect of a stipulation has been addressed by the Seventh Circuit Court of Appeals:

> The Seventh Circuit has explained the difference between judicial admissions and evidentiary admissions:

>> Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are not evidence at all but rather have the effect of withdrawing a fact from contention. A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary

Litchford asserts that an evidentiary gap exists in the Trustee's evidence in that the testimonial evidence fails to show that the funds withdrawn from Bay Vista's Monarch Bank account by Tseng were the same monies used to procure the cashier's check issued by Monarch Bank that was then delivered to Kaufman & Canoles, deposited in their trust account, and ultimately transferred to Litchford. However, an examination of two relevant exhibits stipulated to by the parties and accepted into evidence by the Court fills the gap left by the testimony. Plaintiff's Exhibit 1[20] is a copy of a check numbered 1019 in the amount of $100,000.00 written from account number 100257476 held in the name of "Bayvista, Inc." at Monarch Bank. The check is dated April 20, 2005, and it appears that the check was negotiated and posted on the same date. The words "Kaufman & Canole" [*sic*] are written in the memo area of the check. The parties have stipulated that this check was signed by Mr. Tseng.

The parties also stipulated to the admission of Plaintiff's Exhibit 2,[21] which contains a Monarch Bank account statement dated April 30, 2005, for the same account as denoted on the check found in Plaintiff's Exhibit 1. The statement shows the $100,000.00 withdrawal made by check number 1019 from the account on April 20, 2005. The statement contains the phrase "Over Counter Check" to the right of check number 1019. Litchford expressly stipulated that the

---

evidentiary admissions, in contrast, may be controverted or explained by the party.

*Rohn Prods., Int'l, LC v. Sofitel Capital Corp. USA*, Civil No. WDQ-06-0504, 2010 WL 681304, at *4 n.10 (D. Md. Feb. 22, 2010) (slip opinion) (citing *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995)).

[20] Litchford included this identical exhibit among its exhibits. *See* Defendant's Exhibit R.

[21] This exhibit is also found among Litchford's exhibits. *See* Defendant's Exhibit S.

41

"cashier's check," as a defined term in the Stipulation describing the $100,000.00 cashier's check issued by Monarch Bank on April 20, 2005, payable to Kaufman & Canoles, was deposited in the Kaufman & Canoles trust account.  The parties also stipulated that "the check stub issued with the cashier's check indicated as 'transaction description' the words 'Over Counter Check.'" Stipulation, at 4.  Further examination of the check stub (contained in Defendant's Exhibit E, which is among the exhibits stipulated to by the parties) reveals that the check stub contains, in the box designated "Account Number," the number 100257476—the same account number as that contained on the check exhibited at Plaintiff's Exhibit 1 and on the bank statement exhibited at Plaintiff's Exhibit 2, both stipulated exhibits.

Accordingly, regardless of any gaps in the testimonial evidence as to the transfer of the exact monies from Bay Vista to Kaufman & Canoles, the Stipulation combined with the evidence contained in the aforementioned exhibits establishes by a preponderance of the evidence that monies of Bay Vista were the same monies used to procure the cashier's check deposited into the Kaufman & Canoles trust account and ultimately transferred to Litchford.  Therefore, the Court finds that the Trustee has proven the first element under § 548.

## 2.  Insolvency or Unreasonably Small Capital

With respect to the element of insolvency, the Fourth Circuit Court of Appeals has instructed:

> Courts generally rely upon the Bankruptcy Code's definition of insolvency for the purposes of § 548(a)(1)(B).  *See Porter*, 37 B.R. at 61.  Section 101(32) of the Bankruptcy Code provides that, for an individual, insolvent means:

> > [A] financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive

42

of—

(i) property transferred, concealed, or removed with
intent to hinder, delay, or defraud such entity's
creditors; and

(ii) property that may be exempted from property of
the estate under section 522 of this title.

11 U.S.C. § 101(32) (1994).  All liabilities must be considered in determining
whether a debtor was insolvent at the time of the transfer in question.  *Porter*, 37
B.R. at 61.

*Tavenner v. Smoot*, 257 F.3d  401, 409 n.2 (4th Cir. 2001) (citing *Hyman v. Porter* (*In re Porter*),

37 B.R. 56, 61 (Bankr. E.D. Va. 1984)).

"Insolvency is determined by a balance sheet test.  A debtor is insolvent when the sum of the

debts is greater than the sum of the assets.  'Unreasonably small capital' is met when the debtor was

engaged in, or about to be engaged in, a business or transaction for which any property remaining

with the debtor was unreasonably small capital." *Whitaker v. Mortgage Miracles, Inc.* (*In re Summit*

*Place, LLC*), 298  B.R. 62, 74 (Bankr. W.D.N.C. 2002) (citing *Huennekens v. The Gilcom Corp. of*

*Va.* (*In re SunSport, Inc.*), 260 B.R. 88, 116 (Bankr. E.D. Va. 2000)).  "A determination that the

debtor has 'unreasonably small capital' is a question of fact." *In re SunSport, Inc.*, 260 B.R. at 116.

The term "unreasonably small capital" is undefined by the Bankruptcy Code:

Neither the Bankruptcy Code nor the [Uniform Fraudulent Conveyance Act] defines
the term "unreasonably small capital."  Courts have held, however, that "an
'unreasonably small capital' would refer to the inability to generate sufficient profits
to sustain operations." *In re Doctors Hosp.*, 360 B.R. at 870, quoting *Moody v. Sec.*
*Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).  The proper test is
objective: the court should ask whether the parties' projections regarding the ability
to sustain operations were reasonable.  *Id.*, quoting *Moody*, 971 F.2d at 1073.  So

long as those projections were reasonable at the time they were made, they will not be rejected simply because they were ultimately proven wrong. *Moody*, 971 F.2d at 1074.

*Baldi v. Samuel Son & Co.* (*In re McCook Metals, L.L.C.*), No. 05 C 2990, 2007 WL 4287507, at *13 (N.D. Ill. Dec. 4, 2007).

The Third Circuit Court of Appeals recognizes that unreasonably small capital "'denotes a financial condition short of equitable insolvency.'" *Peltz v. Hatten*, 279 B.R. 710, 744 (D. Del. 2002) (quoting *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d. 1056, 1070 (3d Cir. 1992)). Furthermore, "the test for unreasonably small 'capital' should include . . . all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Id.* at 745 (quoting *Moody*, 971 F.2d at 1072 n.24). "Unreasonably small capital 'encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future.'" *Doctors Hosp. of Hyde Park, Inc. v. Desnick* (*In re Doctors Hosp. of Hyde Park, Inc.*), 360 B.R. 787, 870 (Bankr. N.D. Ill. 2007) (quoting *Vadnais Lumber Supply, Inc. v. Byrne* (*In re Vadnais Lumber Supply, Inc.*), 100 B.R. 127, 137 (Bankr. D. Mass. 1989)).

One court has reasoned that an analysis of "unreasonably small capital" involves examination of the debtor's cash flow and available operating capital. *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993) (citing *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 998 (Bankr. S.D. Ohio 1990)). "'This analysis requires a court to examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable.'" *Id.* (quoting *In re Suburban Motor Freight, Inc.*, 124 B.R. at 998). As one court has noted, "[t]he term 'unreasonably' is relative and requires judicial consideration of the

44

overall state of affairs surrounding the corporation and the challenged transfer itself." *In re Suburban Motor Freight, Inc.*, 124 B.R. at 999 (citing *Barrett v. Cont'l Ill. Nat'l Bank & Trust*, 882 F.2d 1, 4 (1st Cir. 1989)).  In other words, "[c]ourts' inquiries must weigh the raw financial data against the nature of the entity and the extent of the entity's need for capital during the time-frame in question." *Id.* (citing *Barrett*, 882 F.2d at 4; *Kepler v. Atkinson* (*In re Atkinson*), 63 B.R. 266, 269 (Bankr. W.D. Wis. 1986)).  Ultimately, "'[the] meaning [of unreasonably small capital] must, therefore, be ascertained upon a case-by-case review of the capital structure of a debtor's business.'" *Rieser v. Hayslip* (*In re Canyon Sys. Corp.*), 343 B.R. 615, 650 (Bankr. S.D. Ohio 2006) (quoting *In re Suburban Motor Freight, Inc.*, 124 B.R. at 998)).

Litchford does not contest that Bay Vista did not receive reasonably equivalent value for the $100,000.00 transferred to Litchford.  *See* Tr. at 147-48, 159 (testimony by Mr. Litchford that his firm did not, at any point in time, represent Bay Vista and that he was not familiar with the name "Bay Vista" until the commencement of the instant proceeding); *see also id.* at 171-72 (representation by Litchford's counsel that this element was not contested by Litchford).  However, Litchford disputes that the Trustee has shown the remaining required elements for recovery under § 548 of the Bankruptcy Code.  Litchford specifically asserts the Trustee has failed to prove by a preponderance of the evidence that Bay Vista was insolvent or had unreasonably small capital remaining at the time of the Transfers.  Therefore, this Court must examine the financial circumstances of Bay Vista at the time of the Transfers to determine if Litchford's argument warrants merit.

a. Evidence of the Financial Circumstances of Bay Vista

The evidence adduced at trial regarding the financial condition of Bay Vista at the time of

45

the Transfers here is scant.  The Stipulation sets forth that a bank account in the name "Bayvista,

Inc." was maintained at Monarch Bank in 2005.  Stipulation, at 3.  The balance of the Monarch Bank

account at the beginning of each month from January 2005 through October 2005 ranged from a

high of $240,118.13 in each of January, March, and April to a low of $56,081.13 in July.  *See id*.

at 6.  Bay Vista also had a money market account at Monarch Bank with a starting balance of

$75,000.00, which was inactive until September 2005, when $15,000.00 was deposited and

$90,569.03 was withdrawn, closing the account.  *Id*.  Prior to the transfer of the Property to Bay

Vista, the prior owner of the Property, Tseng Trust 2, had executed three deeds of trust on the

property to secure advances made under three notes payable to McLeskey and Associates, LLC, in

the respective amounts of $960,000.00, $800,000.00, and $600,000.00.  After acquiring the Property,

on or about June 20, 2005, Bay Vista granted to McLeskey and Associates, LLC, an additional deed

of trust securing advances up to a stated principal amount of $1,000,000.00.  *Id*. at 7.  On February

23, 2005, Bay Vista agreed to pay S.B. Ballard Construction Company up to $374,800.00 for pre-

construction site work.  Ballard issued its first payment application in the amount of $95,981.00 on

February 28, 2005.  *Id*.; Plaintiff's Exhibit 34, First Payment Application by S.B. Ballard

Construction Company dated February 28, 2005.[22]  Subsequent applications for payment were issued

by Ballard on March 31, 2005, for $152,623.00; on June 10, 2005, for $196,156.58; and on August

9, 2005, for $233,897.00.  Defendant's Exhibit W, Second Payment Application by S.B. Ballard

Construction Company dated March 31, 2005; Defendant's Exhibit X, Fourth Payment Application

---

[22] This document was also included among Litchford's exhibits.  *See* Defendant's
Exhibit V.

by S.B. Ballard Construction Company dated August 9, 2005.[23]  The August 9, 2005, application

showed previous payments of $196,356.58 had been made to Ballard.  Stipulation, at 7.  Finally,

gleaned from the Stipulation is that McLeskey caused the Property to be sold at foreclosure on

October 6, 2005, where the final bid was in the amount of $5,000.000.00 by an affiliate of

McLeskey.  The Commissioner of Accounts initially approved payment of $4,123,018.68 in real

estate taxes, sale expenses, and the payoff due to McLeskey, leaving a surplus of $876,981.32.  *Id.*

It is far more laborious to state the unknowns of the financial condition of Bay Vista at the

time of the transfers in question than to chronicle what little is certain from the evidence here.

Unproven is whether Bay Vista had any assets but for the Property and the two stipulated Monarch

Bank accounts.  The Trustee can only state he found no records of additional assets among the

papers of Bay Vista, and the bankruptcy schedules and statement of financial affairs of Bay Vista,

prepared nearly two years after the transfer by the Wu Parties, set forth no such assets.  Tr. at 92-93,

111, 113-15.  The schedules of Bay Vista list a number of causes of action that the Trustee believes

have nominal or no value, but the Trustee admits he is uncertain as to when any of these alleged

causes of action arose, whether before, simultaneously with, or after the Transfers here.  *Id.* at 93-95,

115.

The capital structure of Bay Vista remains undisclosed.  No balance sheet or sheets or any

financial compilations of any date for Bay Vista have been exhibited.  The liabilities of Bay Vista

prior to the time of the transfers here are known only to include the Ballard applications for payment

dated February 28, 2005, in the amount of $95,981.00; and March 31, 2005, for $152,623.00, of

---

[23]  No explanation was provided at trial regarding why the Third Payment Application by
S.B. Ballard Construction Company for the June 10, 2005, payment request was not provided
among the exhibits of either party.

which a portion appears to have been paid at some time; and some undetermined amount outstanding on the McLeskey Notes and Deeds of Trust, for which it is unknown whether Bay Vista has any direct liability.[24]   The evidence before this Court does not permit a determination of the amounts owed under the McLeskey Notes and secured by the McLeskey Deeds of Trust upon the Property. The McLeskey Notes each are in the form of a line of credit, permitting draws by the maker thereunder from time to time up to the stated principal amounts of each respective note. Accordingly, because of this feature, the face amount of each McLeskey Note does not establish the balance thereunder at any one given time.

The Trustee urges that the Court may calculate the amounts owed on the McLeskey Notes and secured by the Property at the time of the Transfers by utilization of the documentary evidence adduced at trial.   For the reasons afore stated, the Wilson Letter is inadmissible as evidence and provides no basis for even an estimation of the amounts owed under the McLeskey Notes at the time of the Transfers.   Even if the First Account was admissible, the First Account only sets forth the balances claimed by McLeskey at the time of the foreclosure on the Property, conducted on October 5, 2005, approximately five months after the Transfers.   The Court simply has no reasoned, non-speculative basis to establish the balances owed on the McLeskey Notes at the critical time of the

---

[24]   An issue unresolved in the pending adversary proceeding by the Trustee against McLeskey, Adversary Proceeding Number 08-07046-SCS, involves the determination of the circumstances of the transfer of the Property from Tseng Trust 2 to Bay Vista as it pertains to the McLeskey Notes and Deeds of Trust; whether these instruments were assumed by Bay Vista or otherwise dealt with; and whether Bay Vista has any contractual claims that it may assert against McLeskey under the McLeskey Notes. *See Smith v. McLeskey* (*In re Bay Vista of Virginia, Inc.*), Civil Action No. 2:09cv46, 2009 WL 2900040 (E.D. Va. June 2, 2009) (adopting the Bankruptcy Court's Report and Recommendation, Adv. No. 08-07046-SCS, 2009 WL 903254 (Bankr. E.D. Va. Feb. 2, 2009)).   A hearing is currently scheduled for April 14, 2010, on McLeskey's recently filed Motion for Summary Judgment.

Transfers in April and May, 2005.  Accordingly, given this absence of evidence, the Court must

determine as a matter of fact there has been no proof adduced by the Trustee of the amounts owed

under the McLeskey Notes.

Even if the Court was willing to embrace the Second Appraisal of Mr. McKnight and

completely ignore its shortcomings, principal of which is the uncertainty as to what improvements,

if any, existed on the Property at the time of the Transfers,[25] in the absence of any evidentiary

establishment of the encumbrances on the Property at best but half a loaf is here.

The Trustee, however, directs the Court to the fact that it is undisputed the Property was

foreclosed on in October 2005, proving, he believes, that Bay Vista must have been insolvent or

rendered insolvent by the Transfers or have been plagued with an unreasonably small capital at a

time just five months prior.  This supposition is not sufficient to overcome the lack of more concrete

financial information concerning Bay Vista.  What occurred in the ensuing five months to provoke

McLeskey to foreclose the liens of the McLeskey Deeds of Trust is simply untold by the evidence.

It is doubtless that the conduction of the foreclosure some five months after the Transfers suggests

that, founded upon experience in other unrelated circumstances, the precipitous events culminating

in the foreclosure may not have originated immediately prior to October 2005; but, in the absence

of evidence, such a speculation is merely that and grossly insufficient to demand the factual

determination of insolvency or unreasonably small capital on the part of Bay Vista.[26]  Those who

---

[25]  The retrospective nature of the Second Appraisal operates to lessen its credibility as an
accurate estimate of the value of the Property as of the date of the Transfers, but most
problematic is its assumption that any improvements on the Property at the time of the Transfers
provided no value despite the probability that construction was then underway at the Property.

[26]  This inability to use the occurrence of the foreclosure to establish the insolvency or
unreasonably small capital some five months before is especially clear when the Court is aware

could have told the financial story of Bay Vista, such as Tseng or perhaps McLeskey or others,[27]

were not forthcoming at trial.[28]

---

that an $11,000,000.00 judgment was entered against Tseng and others (but not Bay Vista) in the Florida litigation in May 2005, shortly after the occurrence of the Transfers here.  *See Smith v. McLeskey* (*In re Bay Vista of Virginia, Inc.*), 394 B.R. 820, 825, n.1 (Bankr. E.D. Va. 2008).  If one is given to speculation, the effect this event may have had on Tseng and his ability to develop the Property is fodder for contemplation.  However, as with other aspects of the financial history of Bay Vista, such musings may not be looked to as evidentiary support for any legal conclusions.

[27]  The parties stipulated that Mr. Wu "took over the company" post-October 2005. Stipulation, at 2.

[28]  In his argument, the Trustee lamented the circumstances that made his production of proof of insolvency and undercapitalization problematic:

> For a $100,000 case could we have brought a McLeskey CFO in to testify as to the value of what was owed?  Yeah, we could have, but we're not going to especially since we're already meshed in litigation with them on another basis; they would not have been a cooperative witness.

> Could we have brought in the Goodman & Company representative to testify to that letter, that they had written that letter?  Yeah, we could have, but we would have then been confronted with a hearsay objection, the same one we're hearing now, that this was based on the McLeskey witness to begin with, so there would be an objection there.

> Could we have brought in an SB Ballard representative to talk about the mechanic's lien and the value there?  We could have, but that's more than I think we can justify in connection with this case.

> Could we have brought in Adam White, as the drafter of the accounting sale who testified what he saw from – where he got his numbers from?  Yes, we could have, but, once again, we'll be confronted with hearsay objections on where his state of knowledge is.

> The problem for this trustee is that Mr. Tseng is not available.  The problem for this trustee is that when Mr. Tseng came into place, he [the Trustee] had a set of schedules and a set of circumstances and he did the level best he could to research the financial affairs and find what information he had to determine what assets were available and what liabilities were out there that he had to look at.  And he did that based upon what was available to him.

50

This dilemma is not unknown to other trustees:

> There is no real evidence of the capital structure of the debtor either
> before or after the transfers in question. The only document in
> evidence that purports to show the financial situation of the debtor is
> Filing No. 183. As with the insolvency analysis, it is impossible to
> determine from Filing No. 183 the actual capital position of the
> debtor. There is no evidence of value of the business as an ongoing
> entity, or the fair value of the assets even on a liquidation basis, and
> there is no analysis of the debt listed on Filing No. 183. The trustee
> even testified that he did not believe there was any supporting
> documentation for a number of the entries on Filing No. 183.

*Killips v. Schropp* (*In re Prime Realty, Inc.*), 376 B.R. 274, 280-81 (Bankr. D. Neb. 2007). The

Trustee argues that the circumstances here demand he be granted leniency as to his burden of proof,

given the fact the principal of Bay Vista has absconded and the records of Bay Vista are in disarray.

The Trustee also pleads with this Court to bear in mind the relatively small amount in controversy

in reaching a decision as to whether he has sustained his burden of proof here. Judge Kishel has

well instructed on the balance of sympathy for the demands of a trustee and the requirements of the

Bankruptcy Code:

> This terminates litigation that portended a multi-million-dollar recovery for the
> estate, at least nominally. The result is none too savory, given the nature of the
> Plaintiff's accusations and the dominance of the Debtor's debt structure by claims
> in favor of the trade vendors that kept it operating during its downspin. One cannot
> say that the termination was premature, however; the governing rule demanded it,
> given the Plaintiff's failure to stand and deliver. Trustees in bankruptcy often have
> an unenviable lot—saddled with the wreckage of businesses brought down by
> mismanagement or wrongdoing and having to pursue redress for it, inheriting poor
> or non-existent business records, forsaken by management scattered to new jobs and
> witnesses gone to ground. These unavoidable incidents of their duty do make it more

---

Tr. at 177-78. The Court believes that Trustee's counsel's reference to Mr. Tseng in the
sentence which begins, "The problem for this trustee . . ." was mistaken, given the context of the
sentence, and that he meant to refer instead to the Trustee, Mr. Smith.

difficult to carry on litigation for the estate, and sometimes merit some leniency on procedural considerations. Nonetheless, if trustees sue out complex lawsuits in the performance of their duties, they cannot expect to be exempted from the same burdens of proof that all other litigants must bear on an opponent's dispositive motion.

*Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 368 n.64 (Bankr. D. Minn. 1999). The Trustee has failed to prove by a preponderance of the evidence the necessary elements of his claim pursuant to 11 U.S.C. § 548 that Bay Vista was insolvent at the time of the Transfers, was rendered insolvent by the Transfers, or was conducting its business with an unreasonably small capital following the Transfers.

To the extent that the Trustee alleged that after the Transfers were made, Bay Vista "intended to incur, or believed that [Bay Vista] would incur, debts that would be beyond [Bay Vista]'s ability to pay as such debts matured," (11 U.S.C. § 548(a)(1)(B)(ii)(III)), the Court also finds that the Trustee has failed to sustain his burden of proof on this element due to the lack of evidence regarding Bay Vista's financial condition at the time of the Transfers. Therefore the Trustee's claim against Litchford must be dismissed.[29]

An order consistent with the findings contained herein will be entered by the Court.[30]

The Clerk is ORDERED to forward a copy of this Memorandum Opinion to Tom C. Smith,

---

[29]  Much of the evidence and argument at trial was consumed with the issue of whether Litchford was an "initial transferee" for the purposes of 11 U.S.C. § 550. As the Trustee has failed to provide adequate evidence to sustain a judgment against Litchford pursuant to 11 U.S.C. § 548, it is unnecessary for the Court to adjudicate whether Litchford was an "initial transferee" for the purposes of 11 U.S.C. § 550. Likewise, it is unnecessary for this Court to discuss the exhibits that were admitted at trial but that were not discussed above, as the Court has determined that those exhibits are not probative of the issues discussed *supra*.

[30]  As the Court has found the Complaint of the Trustee must be dismissed for the reasons stated *supra*, the Court treats the Motion for Directed Verdict as moot.

Jr., Chapter 7 Trustee; Peter G. Zemanian, counsel for Mr. Smith; David A. Greer, counsel for

Litchford & Christopher, P.A.; and Debera F. Conlon, Assistant United States Trustee.

**Entered this 1st day of April, 2010, at Norfolk, in the Eastern District of Virginia.**

Stephen C. St. John

United States Bankruptcy Judge

53